# EXHIBIT A

JEFF FINE
Clerk of the Superior Court
By Fawn Fowler, Deputy.
Date 03/22/2022 Time 16:56:35
Description                Amount
--------- CASE# CV2022-003548 ---------
CIVIL NEW COMPLAINT         333.00
----------------------------------------
TOTAL AMOUNT                333.00
Receipt# 28687237

William M. Fischbach, SBN# 019769
David M. Barlow, SBN# 035812

**TIFFANY & BOSCO**
P.A.
SEVENTH FLOOR CAMELBACK ESPLANADE II
2525 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016-4237
TELEPHONE: (602) 255-6000
FACSIMILE: (602) 255-0103
EMAIL: wmf@tblaw.com; dmb@tblaw.com

*Attorneys for Plaintiffs*

## SUPERIOR COURT OF THE STATE OF ARIZONA

## FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| L.M.W., individually, and as the biological father and on behalf of L.W., a minor,<br><br>Plaintiff,<br><br>vs.<br><br>THE STATE OF ARIZONA; JONAS PERRY and Jane Doe Perry, Husband and Wife; ANITA MCDONALD and JOHN DOE MCDONALD, Wife and Husband; ANNA APOLINAR and JOHN DOE APOLINAR, Wife and Husband; CHRISTINA GARY and JOHN DOE GARY, Wife and Husband; BRITTANY SCOTT-MEMBRILA and JOHN DOE MEMBRILA, Wife and Husband; SONYA TYUS and JAMES TYUS, Wife and Husband; A NEW LEAF, INC., and Arizona nonprofit corporation,<br><br>Defendant. | Case No. CV2022-003548<br><br>**COMPLAINT**<br><br>• Gross Negligence<br>• Willful and Wanton Conduct/Negligence<br>• Loss of Consortium<br>• Civil Rights Violations, 42 U.S.C. § 1983<br><br>**TIER 3** |

### Introduction

1. This is a case about the government's removal of a child from his father's home through the use of material misrepresentations, mischaracterizations, inaccuracies, and false statements, and its subsequent failure to protect the child from sexual abuse after

1

placing the child into a foster home. Plaintiff has filed this claim to hold the defendants accountable for their gross malfeasance.

## Parties, Jurisdiction, and Venue

2. Plaintiff ▮▮▮ (▮▮▮ or "Plaintiff") and his minor son, ▮▮▮ were, at all times relevant, residents of Maricopa County.

3. Defendant State of Arizona (the "State") was, at all relevant times, acting through the Arizona Department of Child Safety ("DCS") and the DCS employees joined to this action.

4. Defendants Jonas Perry ("Perry") and Jane Doe Perry are a married couple residing in Maricopa County. Perry was, at all relevant times, a DCS investigator.

5. Defendants Anita McDonald ("McDonald") and John Doe McDonald are a married couple residing in Maricopa County. McDonald was, at all relevant times, a DCS supervisor.

6. Defendants Anna Apolinar ("Apolinar") and John Doe Apolinar are a married couple residing in Maricopa County. Apolinar was, at all relevant times, a DCS caseworker.

7. Defendants Christina Gary ("Gary") and John Doe Gary are a married couple residing in Maricopa County. Gary was, at all relevant times, a DCS caseworker.

8. Defendants Brittany Scott-Membrila ("Scott-Membrila") and John Doe Scott-Membrila are a married couple residing in Maricopa County. Scott-Membrila was, at all relevant times, a DCS caseworker.

9. Perry, McDonald, Apolinar, Gary, and Scott-Membrila are collectively referred to as the "DCS Defendants."

10. At all relevant times, the DCS Defendants were actively involved in, and aware of, the matters set forth below, and mutually aided and abetted each other.

11. At all relevant times, the DCS Defendants were acting in the course and scope of their employment/agency with DCS.

12. Defendant A New Leaf, Inc. FKA Prehab or Arizona Inc. is an Arizona non-profit corporation.

13. Defendants Sonya Tyus ("Tyus") and James Tyus are a married couple residing in Maricopa County. Tyus was, at all relevant times, an employee and/or agent of A New Leaf.

14. The individual defendants were, at all relevant times, acting in furtherance of, and for the benefit of, their marital community and their spouses are joined under A.R.S. § 25-215.

15. Venue is proper in this Court under A.R.S. § 12-401.

16. This case qualifies for Tier 3 designation under Ariz. R. Civ. P. 26.2.

17. Plaintiff served a Notice of Claim dated September 14, 2021 at to all defendants in accordance to A.R.S. § 12-821.01. On information and belief, Scott-Membrila deliberately evaded service of the Notice of Claim, resulting in a delay in service until November 7, 2021.

18. This Court has jurisdiction over this action under A.R.S. § 12-123 and the Arizona Constitution, Article VI, § 14.

## GENERAL ALLEGATIONS

19. ▇ is the minor biological child of ▇ and non-party ▇ ("▇").

20. ▇ and ▇ shared parenting time and legal decision making over ▇ pursuant to a court order.

21. ▇ disagreed with many of the parenting choices that ▇ made. Not wanting to break a court order, however, ▇ simply resolved to make the best of the parenting arrangement and allowed ▇ to have her parenting time despite his personal misgivings.

22. On November 30, 2020, DCS Perry applied for and obtained an order authorizing DCS to take ▇ into temporary physical custody. Perry verified the application under oath.

3

23. In the application, Perry represented that probable cause existed to believe that ▇ was suffering from abuse or neglect and that it would be contrary for ▇ to remain in ▇ home because her "behavior is violent, erratic, unpredictable, incoherent, and totally inappropriate and is a threat to [▇'s] safety."

24. As for ▇, Perry claimed he was a suspected drug trafficker and was aware of ▇ criminal activity but—despite the court order setting parenting time—failed to "take protective action over [the child]." These statements were false and without factual support. ▇ is not a drug trafficker and, although ▇ would occasionally smoke marijuana in his home, he was a medical marijuana card-holder and did not smoke marijuana in ▇ presence and stored his marijuana on a high shelf so that ▇ could not access it.

25. Perry found less intrusive options neither feasible nor sufficient to manage ▇ safety, primarily because ▇ had refused to cooperate with DCS. But in Perry's view, placing the child in ▇ custody was not an option because his "only support is his mother," who Perry claimed had help ▇ "break the terms of his past probation." This statement was false and without factual support. ▇ mother, ▇, has no criminal history nor has she assisted ▇ in violating any probationary terms.

26. Perry further claimed that ▇ "would show up to school high off of marijuana from" ▇. These statements were false and without factual support. Presumably referring to ▇, Perry concluded that ▇ "does not recognize safety threats for ▇] but leaves him in situations that endanger him."

27. On December 9, 2020, DCS filed a dependency petition alleging that, despite its diligent efforts, it had been unable to locate ▇ to take the child into temporary custody.

28. The petition stated that ▇ told DCS that ▇ was with ▇, however, none of the addresses she provided were ▇ and "he has not returned . . . messages left on his phone."

4

29. The petition further claimed that DCS attempted to identify and place the child with a grandparent or other family member and would assess family placement options after removing ▮▮▮ from the parents' custody. But these statements were false and without factual support.

30. Upon information and belief, DCS did not follow its own internal processes and procedures to find the child, including without limitation failing to verify ▮▮▮ address with the Department of Education, the Maricopa County Assessor, and the Maricopa County Recorder.

31. A day later, the superior court issued an order for a pickup of a minor child.

32. ▮▮▮ did not receive notice of either the petition or the pickup order.

33. On December 11, 2020, a meeting was held with Perry, other DCS employees, ▮▮▮, and ▮▮▮ paternal grandmother ▮▮▮ ("▮▮▮").

34. During the meeting, ▮▮▮ offered to be ▮▮▮ foster guardian. ▮▮▮ did not object to this arrangement.

35. At Perry's request, ▮▮▮ also provided him with what information she could recall about ▮▮▮ new home address. Soon enough, however, the meeting devolved into a back and forth over whether ▮▮▮ had ever accused ▮▮▮ of being a drug trafficker, as Perry claimed.

36. On the evening of December 17, 2020, DCS removed ▮▮▮ from ▮▮▮ care and placed him in a foster home.

37. Four days later, DCS caused ▮▮▮ to undergo a rapid response assessment with La Frontera Arizona. The assessment noted that the DCS referral indicated that, "when asked if [the child] has been touched by anyone that makes him feel uncomfortable[,] he replies yes but shuts down after making this statement." The assessment concluded that child neglect or abandonment was suspected, and referred the child to ongoing services. It is also believed that DCS took ▮▮▮ to Phoenix Children's Hospital for medical testing without either parent's consent.

38. DCS placed ▇ in a foster home operated by A New Leaf shortly after removing ▇ from ▇ care.

39. At the time, Sonya Tyus supervised the foster home. Upon information and belief, Sonya Tyus has been previously convicted of crimes of moral turpitude. Tyus was found guilty of issuing dishonored checks in Oakdale, Minnesota with a court disposition date of November 2, 1995. Tyus was again convicted of issuing dishonored checks with a court disposition date of May 9, 2016 in Anoka County, Minnesota.

40. ▇ was in the foster home from December 18, 2020 to January 27, 2021. Meanwhile, ▇ continued to insist to DCS he would undergo drug testing or take parenting classes—whatever was necessary—if it meant DCS would return ▇ to his care. ▇ also asked, to no avail, about ▇ reported hospitalization. At around the same time, ▇ renewed her request to be ▇ guardian to Perry who stated he would need to run a background check on her beforehand.

41. ▇ later heard she had been denied placement and called Perry to find out more. Surprised that she had heard this news, Perry eventually explained to her that she would be receiving a letter from the Attorney General's office to explain the denial. No such letter ever came; instead, Perry sent ▇ a letter dated January 4, 2021, explaining ▇ could not be placed with her because she had failed to cooperate with DCS. Perry, however, had already committed to the false narrative that ▇ helped ▇ violate his parole and was thus an unsuitable placement for L.W.

42. Perry disseminated further false statements about ▇ fitness to act as ▇ guardian, including that she knew ▇ had been exposed to illegal drugs—even presenting to school with marijuana in his hair—but did not have any problems with that behavior. Although ▇ was denied placement, ▇ was eventually placed with his paternal aunt and uncle, ▇ and ▇ after he left the home on January 27, 2021.

43. While ▇ was in foster care, ▇ ability to interact with the child was limited to short visitations. On their January 4, 2021 visit, ▇ noticed severe scratches

6

1  on ▮▮▮ back. Despite bringing this to DCS's attention, DCS never contacted ▮▮▮
2  with information about the investigation.

3      44.    DCS caseworker Gary, herself a mandatory reporter, was made aware of the
4  scratches and potential abuse, but likewise failed to make any investigation or take any
5  corrective action.

6      45.    Only later did DCS's child advocate, Sarah Bruce ("Bruce"), report that the
7  DCS caseworker assigned to ▮▮▮ case, Scott-Membrila, had deemed the scratches on
8  ▮▮▮ back not to be an ongoing issue.

9      46.    On February 4, 2021, ▮▮▮ informed Bruce that he had heard reports that
10 ▮▮▮ had made disclosures regarding molestation and abuse. Scott-Membrila then
11 informed him that this had been noted in the rapid response assessment conducted on
12 December 21, 2020 but that there was no evidence of abuse. In other words, Scott-
13 Membrila assured ▮▮▮ that there was nothing to worry about at this stage.

14     47.    Scott-Membrila's assurances did not hold for long. On March 19, 2021,
15 ▮▮▮ ("▮▮▮"), the paternal aunt with whom ▮▮▮ was recently placed,
16 contacted the DCS hotline to report that ▮▮▮ had made disclosures of abuse concerning
17 his time in foster care. Specifically, ▮▮▮ reported experiencing sexual abuse at the hands
18 of another juvenile at the home. The next day, ▮▮▮ explained these disclosures to a
19 DCS parental aide who then informed Scott-Membrila. ▮▮▮ would later convey this
20 information to ▮▮▮.

21     48.    Specifically, ▮▮▮ reported experiencing sexual abuse at the hands of
22 another juvenile ("Child 1") at the foster home. ▮▮▮ reported that Child 1 at the house
23 had ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
24 L.W. reported that this occurred on multiple occasions in multiple places in the house.

25     49.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
26 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
27 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
28

50. █████████████████████████

51. █████████████████████████ During a subsequent supervised parental visitation with ███ and ███, ███ explained these disclosures to a DCS parental aide with the hopes of her being able to provide her brother with some emotional support and skills to help him work through some very difficult time. The parent aide subsequently informed Scott-Membrila. During the ensuing day(s), ███ would later convey this information to ███

52. Three months after ███ first disclosed abuse, Scott-Membrila then contacted the Department of Public Safety to investigate the New Leaf home.

53. The investigation confirmed that at least one of ███ abusers had likewise undergone sexual abuse.

54. DCS case worker Scott-Membrila was subsequently removed from ███ case and DCS's case was dismissed.

55. ███ has been returned to ███ care and custody.

56. Since being returned to his father, ███ has asked ███ several times, "Where were you when they were doing this to me and why didn't you come and get me," or words to that effect.

### Count I – Gross Negligence
(by ███ on behalf of ███ against the State and the DCS Defendants)

57. A negligence claim has four elements: (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages.

58. Typically, a duty of care arises from special relationships based on conduct, contract, or family relations.

59. A grossly negligent breach of that duty occurs when the state or its employees act or fail to act despite knowing, or having reason to know, facts which would lead a reasonable person to realize that their conduct not only creates an unreasonable risk of bodily harm to others but also involves a high probability that substantial harm will result.

60. After removing ▓ from ▓ care and placing ▓ in a foster home, the State and DCS Defendants affirmatively assumed responsibility for that ▓ safety and general well-being.

61. The State and the DCS Defendants breached their duty relative to ▓ because they knew or had reason to know that placing ▓ in foster home and keeping him there, despite disclosures of abuse, created an unreasonable risk of bodily harm to ▓ and there was a high probability that substantial harm would result.

62. The State and the DCS Defendants further breached that duty by failing to follow DCS's own procedures for locating and removing a child, not even evaluating whether paternal aunt and uncle would be a sufficient placement for ▓ instead of a foster home.

63. Moreover, the State and the DCS Defendants breached that duty by collectively failing to act or timely investigate ▓ disclosures or to take corrective action to protect ▓ in any way.

64. As a result of the conduct of the State and the DCS Defendants, ▓ has suffered physical, mental, and emotional trauma, some of which may be permanent in nature, and that will likely require future counseling and other treatment.

### Count II – Willful and Wanton Conduct/Negligence
(by ▒ on behalf of ▒ against A New Leaf and Tyus)

65. A New Leaf and Tyus assumed an affirmative duty and assumed responsibility for ▒ safety and general well-being by taking ▒ into their custody.

66. A New Leaf and Tyus knew or should have known that ▒ faced an unreasonable risk of sexual abuse and it was substantially likely that such abuse would occur.

67. Despite the risks, A New Leaf and Tyus failed to act despite knowing, or having reason to know, facts which would lead a reasonable person to realize that their conduct not only create an unreasonable risk of bodily harm to others but also involved a high probability that substantial harm will result.

68. As a result of the conduct of A New Leaf and Tyus, ▒ has suffered physical, mental, and emotional trauma, some of which may be permanent in nature, and that will likely require future counseling and other treatment.

69. ▒ is entitled to an award of punitive damages against A New Leaf and Tyus because they acted willfully, maliciously, and with an evil mind, or with reckless disregard to the substantial possibility that their actions would cause injury to others.

70. In the alternative, if the conduct of A New Leaf and Tyus does not rise to the level of willful and wanton conduct, this Count is pled in the alternative as negligence.

### Count III – Loss of Consortium
(by ▒ against the State, the DCS Defendants, A New Leaf, and Tyus)

71. As ▒ biological father, ▒ holds a derivative loss of consortium claim relative to Count I and Count II.

72. When all the underlying elements of the child's tort claims are present, the parent possesses a loss of consortium claim to compensate the parent for the loss of love, affection, protection, support, services, companionship, care, and society of the child.

73. In this case, ▒ suffered a severe, permanent and/or disabling injury rendering that significantly damaged the child-parent relationship.

10

74. As a result of the conduct of Tyus and A New Leaf, ▮ has suffered mental and emotional trauma, some of which may be permanent in nature, and that will likely require future counseling and other treatment.

### Count IV – 42 U.S.C. 1983 Civil Rights Claim

(by ▮ individually and on behalf of ▮ against the DCS Defendants)

75. 42 U.S.C. § 1983, provides a cause of action for the deprivation of any rights, privileges, or immunities secured by the Constitution and laws by any person acting under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory.

76. Parents and children have a well-established right to live together free from governmental interference without due process of law.

77. The right has both a substantive and procedural component.

78. State officials may interfere with this right only when they provide parents with fundamentally fair procedures. They cannot seize children and make them wards of the state without first pursuing reasonable avenues of investigation.

79. Further, the intrusion into the parent-child relationship must be reasonably necessary to avert a specific injury to the child. These are indispensable requirements absent reasonable cause to believe the child is in imminent danger of a serious bodily injury.

80. The due process clause of the United States Constitution also contains a substantive component, sometimes referred to as "substantive due process," which bars certain arbitrary government actions regardless of the fairness of the procedures used to implement them. Thus, substantive due process guards against affirmative abuse of government power that shocks the conscience.

81. As set forth above, the conduct of the DCS Defendants violated the substantive and procedural due process rights of both ▮ and ▮

82. Even if not deliberate, state officials are liable—and not entitled to the shield of qualified immunity—for false statements submitted to court they know to be false or would have known were false but for their reckless disregard of the truth.

83. Nevertheless, Perry submitted false statements to the court during the proceedings discussed above, including without limitation that (1) ▮▮▮ was a drug trafficker; (2) ▮▮▮ mother ▮▮▮ had helped ▮▮▮ violate his parole; (3) ▮▮▮ knew ▮▮▮ had been exposed to illegal drugs—even presenting to school with marijuana in his hair—but did not have any problems with that behavior; and (4) ▮▮▮ did not cooperate with DCS. Further, Arizona's litigation privilege does not operate to bar federal civil rights claims.

84. Upon information and belief, Perry would later admit these statements were false.

85. These statements had significant consequences. ▮▮▮ would never have presented to the foster home had qualified for placement.

86. Additionally, the conduct of the DCS Defendants was conscience-shocking. In addition to Perry's misrepresentations in the dependency proceedings, the DCS Defendants did not explore whether ▮▮▮ or ▮▮▮ and her husband ▮▮▮ could serve as a guardian for ▮▮▮. In their apparent zeal to separate ▮▮▮ from his family no matter what, the DCS Defendants failed to conduct an adequate investigation and then made misrepresentations in court to achieve that end. Despite ▮▮▮ frequently writing to the DCS Defendants to explain his willingness to take drug tests and whatever classes were necessary, the DCS Defendants also delayed in providing him with reunification services. And even though ▮▮▮ continually raised concerns about the conditions in the New Leaf home—including the significant scratches on ▮▮▮ back—the DCS Defendants did not even investigate what occurred there until several months after the fact. They failed to do so despite the child's disclosures on December 21, 2020. That failure to act shocks the conscience such that it violates substantive due process.

87. The Fourteenth Amendment's substantive due process clause also protects the liberty interest of children in state custody in social worker supervision and protection from harm inflicted by a third party for the duration of that custody.

88. In that context, deliberate indifference requires a showing of an objectively substantial risk of harm and a showing that the officials were subjectively aware of facts from which an inference could be drawn' that such a risk existed and that either the official actually drew the inference or that a reasonable official would have been compelled to draw that inference.

89. The DCS Defendants violated their duty to protect ▓ from harm for the duration of ▓ time as a ward of the state. To reiterate, ▓ made disclosures of abuse on December 21, 2020. None of the DCS Defendants conducted any reasonable follow up investigation on those disclosures. When ▓ later raised the fact that there were extensive scratches running down ▓ back, the DCS Defendants dismissed his fatherly concern for ▓ physical safety because it was deemed not to be an ongoing issue.

90. As a result of the conduct of the DCS Defendants, ▓ and ▓ have suffered mental and emotional trauma, some of which may be permanent in nature, and that will likely require future counseling and other treatment.

91. ▓ is entitled to an award of punitive damages against the DCS Defendants because they acted willfully, maliciously, and with an evil mind, or with reckless disregard to the substantial possibility that their actions would cause injury to others.

92. As to this Count, ▓ and ▓ seek and award of costs and attorneys' fees under 42 U.S.C. § 1988.

### Count V - 42 U.S.C. 1983 Civil Rights Claim Against Private Parties
(by ▓ individually and on behalf of ▓ against Tyus and A New Leaf)

13

93. 42 U.S.C. liability extends to a private party where the private party engaged in state action under color of law and thereby deprived a plaintiff of some right, privilege, or immunity protected by the Constitution or the laws of the United States.

94. The liability is not limited to individuals. In a *Monell* claim, a plaintiff may seek redress against a private entity that deprived the plaintiff of his or her constitutional rights if the entity's policy, practice, or custom was responsible for the asserted deprivation.

95. *Monell* liability can be premised on a failure to train that amounts to deliberate indifference.

96. Deliberate indifference requires a showing that the entity defendant disregarded a known or obvious consequence of its actions. A pattern of prior violations is not required to demonstrate deliberate indifference; rather, *Monell* liability is proper when the unconstitutional consequences of a failure to train are patently obvious and highly predictable.

97. It is a tragic reality of the foster care system that many of the children have been abused and may face abuse at the hands of other children once inside that system.

98. Given that, the need to adequately train individuals to take precautions to identify and prevent abuse, and to thoroughly investigate disclosures of abuse, is particularly pressing.

99. Despite this environment, and in the face of reports of the abuse suffered by ▮, A New Leaf and Sonya Tyus took no such acts at all. Under the circumstances, the consequences of the failure to train are so obvious that they are deliberately indifferent to the constitutional rights of ▮ and ▮.

100. As a result of the conduct of A New Leaf and Tyus, ▮ and ▮ have suffered mental and emotional trauma, some of which may be permanent in nature, and that will likely require future counseling and other treatment.

101. ▮ is entitled to an award of punitive damages against A New Leaf and Tyus because they acted willfully, maliciously, and with an evil mind, or with reckless disregard to the substantial possibility that their actions would cause injury to others.

102. As to this Count, ▮ and ▮ seek and award of costs and attorneys' fees under 42 U.S.C. § 1988.

**PRAYER FOR RELIEF**

Plaintiffs requests judgment against Defendants as follows:

A. For compensatory special and general damages for Plaintiff's personal injuries, pain and suffering, and mental anguish, both past and future;

B. For Plaintiff's taxable costs pursuant to A.R.S. §12-341;

C. For punitive damages;

D. For an award of costs and attorneys' fees under 42 U.S.C. § 1988; and

E. For such other relief as is appropriate.

RESPECTFULLY SUBMITTED this 22ND day of March, 2022.

TIFFANY & BOSCO
P.A.

By: _____

William M. Fischbach
David M. Barlow
Seventh Floor Camelback Esplanade II
2525 East Camelback Road
Phoenix, Arizona 85016
*Attorneys for Plaintiff*